Filed 1/10/23  In re E.R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.R., a Person Coming Under the Juvenile Court Law. | B317373 |
| _____ | Los Angeles County Super. Ct. No. 19CCJP00279C |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MONICA D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Juvenile Court Referee. Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother Monica D. appeals the juvenile court's order terminating parental rights to son E.R. (born October 2018 and referred to herein as Noah). She does not challenge the juvenile court's decision to terminate her rights. Mother's contention is that the Los Angeles Department of Children and Family Services (DCFS) did not comply with its initial duty of inquiry under Welfare and Institutions Code section 224.2, subdivision (b)[1] in that DCFS failed to ask available extended family members whether Noah is an "Indian child" within the meaning of section 1903 of the federal Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.) She also faults the juvenile court for not personally inquiring of the parents at their initial appearances about possible Indian ancestry.

We find DCFS erred in failing to question extended family members despite having contact with a paternal grandparent and uncle and maternal grandmother and aunts. Although both parents had filled out paperwork indicating no knowledge of Indian ancestry, we find the juvenile court erred in not personally inquiring of them at their initial appearances. However, we conclude, as explained below, the error was harmless because Noah's designated adoptive parent was his paternal uncle.

## BACKGROUND

On January 15, 2019, when Noah was three months old, DCFS filed a section 300 petition alleging Mother left Noah's older half-siblings, ages nine and seven, with their paternal grandmother without a plan for the children's ongoing care and supervision. At the time Mother had disappeared with Noah and

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

their whereabouts were unknown.  At the detention hearing, the court detained the half-siblings from Mother and also detained Noah, noting he was "AWOL."  The court issued a protective custody warrant for him.[2]

Noah was located a month later, on February 15, 2019, living with Mother and maternal grandmother.  On February 26, 2019, he was placed with his paternal uncle, Francisco C.  On March 4, 2019, DCFS filed a first amended petition with an additional allegation that Mother and Father had a history of domestic violence, the half-siblings had witnessed violent altercations, and Mother had failed to protect them.  On May 11, 2019, a second amended petition was filed, adding a count as to Noah's half-siblings only.  At the adjudication hearing on July 19, 2019, Father pled no contest to the domestic violence count of the petition.  The court found against each parent on the domestic violence allegations, found Noah a dependent of the court, and removed him from the care and custody of his parents.  Both parents were required to attend domestic violence, parenting programs, and individual counseling.  Mother was also ordered to attend joint counseling with her children.  Noah remained placed with his paternal uncle.

Fifteen months later, the court found both parents had failed to comply with their case plans and it terminated reunification services.  Paternal uncle Francisco C. and his longtime girlfriend wanted to adopt Noah, who had bonded with them, calling them "mommy" and "daddy."  On October 5, 2020, the court terminated parental rights for both parents and set a permanency planning hearing for Noah.  One year later, on

---

[2]     This appeal concerns Noah and Mother only.

October 4, 2021, the court found Noah adoptable. By then Noah had been in placement with his paternal uncle Francisco C. and uncle's girlfriend for over two and a half years. The court found adoption by Francisco C. appropriate and ordered it as the permanent plan for Noah. On October 3, 2022, the juvenile court again found the plan of adoption appropriate and ordered it as the permanent plan.

As for inquiries into Noah's possible Indian ancestry, on February 28, 2019, Mother filed an ICWA-020 form, checking the box which stated, "I have no Indian ancestry as far as I know." The court found no reason to know ICWA applied. On March 5, 2019, Father filed an ICWA-020 form checking the same box. The court found ICWA did not apply through Father's ancestry. In addition Noah's birth certificate indicated Father was born in Mexico.

The record reflects there were several extended family members from both sides of the family who lived locally and who were not asked about possible Indian ancestry. Mother grew up living with both parents and her five siblings. Mother's father, mother and sisters lived in Los Angeles and provided Mother support. Father lived in Los Angeles County with his mother; paternal uncle Francisco C. lived locally. None were asked about Indian ancestry. Based only on the forms filed by both parents, the court found no reason to believe Noah had Indian ancestry. This appeal followed.

## DISCUSSION

Mother contends the order terminating parental rights should be reversed because DCFS did not inquire of extended family members about Noah's possible Indian ancestry. Mother also faults the juvenile court for not orally inquiring of each

parent at their initial appearances about possible Indian ancestry; she faults DCFS for failing to ask each parent personally about possible Indian ancestry, instead relying on their form denials.

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883.)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement,

usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves on the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) The child protection agency, in this case DCFS, must complete the Indian Child Inquiry Attachment form ICWA-010(A) and attach it to the petition. (Cal. Rules of Court, rule 5.481(a)(1); *In re Dominick D.* (2022) 82 Cal.App.5th 560, 566.)

Here DCFS did not fulfill its duties under section 224.2 as it did not ask extended family members about Indian ancestry,

6

despite having contact information for paternal grandmother, paternal uncle, maternal grandmother, and maternal aunts. In addition, the juvenile court did not personally inquire of each parent when each appeared in court. This was a violation of law. But the next question is whether the error was prejudicial. A prerequisite to reversal of a trial court's decision under California law is s showing of a miscarriage of justice. (Cal. Const., art. VI, § 13.)

We are hard pressed to find a miscarriage of justice. ICWA itself sets out placement priorities. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915(a).) Extended family under ICWA includes uncles. (25 U.S.C. § 1903(2).)

In this case, Noah was detained at the age of three months and placed with his paternal uncle at the age of four months. He remained with his paternal uncle throughout the proceedings. He is now four years old, having lived with his paternal uncle almost his entire life. The juvenile court implemented ICWA's first preference by designating Noah adoptable by his paternal uncle, a logical finding given Noah's lifelong placement and bond with him. The minor is not in danger of being separated from his biological family, the evil ICWA was enacted to prevent.

Mother does not argue her son's proposed adoption by his paternal uncle is contrary to his best interests or lacks good cause. The juvenile court's plan for Noah belies a finding of prejudice under ICWA as it is the first preferred placement had

7

the minor been found to be an Indian child and had his tribe intervened. The abuses ICWA was enacted to prevent are not in play here.

Alternatively, applying the rule for assessing prejudice as set forth in *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578, we find nothing in the record to indicate Mother's and Father's claims were ill-informed, unfounded, or incorrect. Father lived with his parents and Mother was in touch with and supported by her own mother and sisters. Each parent's familiarity with and continuous contacts with their own biological families distinguish this case from *In re A.C.* (2022) 75 Cal.App.5th 1009, where the mother was isolated from her biological family at a young age.

Noah has now spent his entire life of four years with the same caregivers from his own biological family. He is entitled to the security and stability of the adoptive home that is awaiting him, a disposition with which appellant does not quarrel. We find no miscarriage of justice.

**DISPOSITION**

The trial court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        STRATTON, P. J.

I concur:


        GRIMES, J.



        HARUTUNIAN, J.[*]

_____

[*]      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.